UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**04 10801 MEL**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION ) | |
| ) | MAGISTRATE JUDGE _Alexander_ |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. |
| ) | |
| ALLEN M. GLICK, ARTHUR H. FREEDMAN, ) | JURY TRIAL |
| JEFFREY S. EPSTEIN, STEVEN T. MOORE ) | REQUESTED |
| and ROMEO J. PENDOLARI, ) | |
| ) | RECEIPT # _____ |
| ) | AMOUNT $ _150_ |
| Defendants. ) | SUMMONS ISSUED _YES_ |
| ) | LOCAL RULE 4.1 _____ |
|  | WAIVER FORM _____ |
|  | MCF ISSUED _____ |
|  | BY DPTY. CLK _TOM_ |
|  | DATE _4/22/04_ |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY

1.  This case involves insider trading in the stocks of three separate publicly-traded banks by Defendant Allen M. Glick ("Glick") and others. In May 2001, in his capacity as a MetroWest Bank ("MetroWest") director, Glick obtained material, nonpublic information that MetroWest would potentially be acquired. Shortly thereafter, he tipped three associates – Defendants Arthur H. Freedman ("Freedman"), Jeffrey S. Epstein ("Epstein"), and Steven T. Moore ("Moore") – to the acquisition, and directly or indirectly caused five other individuals to buy MetroWest stock. These eight individuals bought a total of 33,140 shares of MetroWest stock, and when Banknorth Group, Inc. ("Banknorth") publicly announced on June 11, 2001 that it would acquire MetroWest,

1

they profited by $99,512.25 when MetroWest's stock price rose in response to the announcement.

2. In addition, on or about June 6, 2002, Glick, then as a director of Banknorth, learned at a Banknorth board meeting that Medford Bancorp ("Medford") was seeking to be acquired, and that Banknorth was interested in potentially acquiring Warren Bancorp ("Warren"). Glick thereafter caused another individual to purchase 3,900 shares of Medford stock and 10,000 shares of Warren stock. Glick also tipped his associate, Defendant Romeo J. Pendolari ("Pendolari"), to the potential acquisition of Warren. Pendolari then bought 800 shares of Warren for himself and also caused another individual to purchase 1,100 shares of Warren. In addition, Glick purchased 43,700 shares of Warren stock for himself, but sold those shares prior to the public announcement of Banknorth's acquisition of Warren when Banknorth's counsel learned about the purchases and advised him to sell the stock.

3. On June 13, 2002, Citizens Financial Group, Inc. announced that it was going to acquire Medford, prompting Medford's stock price to rise dramatically. As a result, the individual Glick caused to purchase Medford stock profited by $32,211 from his Medford trading.

4. On August 8, 2002, Banknorth announced that it was going to acquire Warren, causing Warren's stock price to significantly increase. As a result, Pendolari and the two individuals Glick and Pendolari caused to buy Warren stock made a total of $43,769 in profits on the Warren stock they had purchased.

5. By virtue of his conduct, Glick engaged in fraud in connection with the purchase and sale of securities, in violation of Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Accordingly, the Commission seeks the following relief as to Glick: (i) the entry of a permanent injunction prohibiting Glick from future violations of the federal securities laws; (ii) disgorgement on a joint and several basis equal to the profits from the trading of Defendants Freedman, Epstein, Moore and Pendolari, and disgorgement of the trading profits of those he directly or indirectly caused to buy stock, plus prejudgment interest; (iii) the imposition of a civil monetary penalty; and (iv) an order prohibiting him from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

6. By virtue of their conduct, Defendants Freedman, Epstein, Moore and Pendolari engaged in fraud in connection with the purchase and sale of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Accordingly, the Commission seeks the following relief as to each of them: (i) the entry of a permanent injunction prohibiting him from future violations of the federal securities laws; (ii) disgorgement equal to the profits from his trading (and where applicable, those of the individual he caused to purchase stock), plus prejudgment interest; and (iii) the imposition of a civil monetary penalty.

## JURISDICTION

7. The Commission seeks permanent injunctions and disgorgement pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]. The Commission seeks the imposition of civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

8.  This Court has jurisdiction over this action pursuant to Sections 21, 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78u-1, 78aa]. Additionally, the acts and practices alleged herein occurred primarily within the District of Massachusetts, which is also where the majority of the defendants reside and where the publicly-traded issuers were located.

9.  In connection with the conduct described in this Complaint, Defendants Glick, Freedman, Epstein, Moore and Pendolari directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

10.  Defendants Glick, Freedman, Epstein, Moore and Pendolari, unless enjoined, will continue to engage in the acts, practices, transactions and courses of business alleged herein, or in acts, practices, and courses of business of similar object and purpose.

## DEFENDANTS

11.  Glick, age 62, is a former resident of Framingham, Massachusetts. He currently resides in both Barnard, Vermont and Pemaquid, Maine. Glick was a director of MetroWest (and its predecessors) from 1988 through 2001. Upon Banknorth's acquisition of MetroWest in October 2001, Glick became a director of Banknorth and served in that role until April 2003.

12.  Freedman, age 63, resides in Sudbury, Massachusetts. He and Glick have known each other for more than 20 years.

13.  Epstein, age 62, resides in Framingham, Massachusetts. He and Glick

4

have known each other for over 20 years.

14. Moore, age 50, a former Massachusetts resident, now resides in Ocala, Florida. He and Glick have known each other for over 15 years.

15. Pendolari, age 78, resides in Framingham, Massachusetts. Pendolari, who is a former MetroWest director, has known Glick for over 15 years.

## RELEVANT ENTITIES

16. Banknorth is a bank holding company headquartered in Portland, Maine. During the relevant time period, Banknorth's stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market System. On November 4, 2002, Banknorth's stock began trading on the New York Stock Exchange.

17. MetroWest was a publicly-traded bank based in Framingham, Massachusetts. During the relevant time period, MetroWest's stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market System. MetroWest was acquired by Banknorth during 2001.

18. Medford was a publicly-traded bank based in Medford, Massachusetts. During the relevant time period, Medford's stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market System. Medford was acquired by Citizens Financial Group, Inc. during 2002.

19. Warren was a publicly-traded bank based in Peabody, Massachusetts. During the relevant time period, Warren's stock was registered with the Commission

pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market System. Warren was acquired by Banknorth during 2002.

## FACTS

### A. The MetroWest Acquisition

20. On May 14, 2001, Glick learned from MetroWest's Chief Executive Officer and Chairman of the Board (the "Chairman") that MetroWest might be sold. On May 16, 2001, at a MetroWest board of directors meeting held in Framingham, Massachusetts, the Chairman told Glick and other directors that he had been having discussions with Banknorth and another large bank regarding the possible sale of MetroWest. The Chairman cautioned Glick and the other members of MetroWest's board of directors that the information about the potential sale was strictly confidential and that board members should neither trade in MetroWest securities nor discuss trading with others.

21. In connection with this discussion, MetroWest's board of directors instructed MetroWest's management to pursue a merger transaction with one of those institutions. The board also authorized the execution of a confidentiality agreement between MetroWest and Banknorth. The agreement, which was executed the same day, made confidential all information exchanged between MetroWest and Banknorth, including the fact that negotiations concerning a possible acquisition had occurred and were ongoing.

#### *Defendant Freedman*

22. Hours after the May 16, 2001 board meeting, at or around 7:25 p.m., Glick

6

called his associate, Defendant Freedman, and tipped him to the potential acquisition of MetroWest.

23. Over the next two days (May 17-18), Freedman, who knew that Glick was a MetroWest director, bought 6,200 shares of MetroWest stock at prices ranging from $7.15 to $7.25 per share.

24. Further, just over two weeks later, Freedman spent the weekend of June 2 – 3, 2001 at Glick's house in Vermont, where Glick again tipped him to the potential acquisition of MetroWest.

25. On or about June 5, 2001, Freedman bought an additional 2,000 shares of MetroWest stock at an average of $8.365 per share.

26. In total, Freedman bought 8,200 shares of MetroWest stock while in possession of material, nonpublic information concerning the potential acquisition of MetroWest.

### *Defendant Moore*

27. On May 17, 2001, the day after the MetroWest board meeting, Glick exchanged telephone calls with Defendant Moore. During one or both of those telephone calls, Glick tipped Moore to the potential MetroWest acquisition. At the time, Moore knew that Glick was a director of MetroWest. The next day, Moore bought 410 shares of MetroWest stock at prices ranging from $7.60 - $7.70 per share.

28. In addition, during a telephone call from Moore to Glick on May 21, 2001, Glick again tipped Moore to the pending acquisition of MetroWest. Shortly thereafter, on May 30, 2001, Moore bought an additional 2,115 shares of MetroWest stock, at prices ranging from $8.20 to $8.49 per share.

29. In total, Moore bought 2525 shares of MetroWest stock while in possession of material, nonpublic information concerning the potential acquisition of MetroWest.

### *Defendant Epstein*

30. On Saturday, May 26, 2001, Defendant Epstein attended a wedding with Glick. During the wedding, Glick tipped Epstein to the potential acquisition of MetroWest. At the time, Epstein knew that Glick was a MetroWest director.

31. On or about Tuesday, May 29, 2001 (the next trading day following the May 26 wedding), Epstein bought 7,000 shares of MetroWest stock at prices ranging from $7.75 to $8.25 per share.

32. In addition, Epstein told another individual that he was buying MetroWest stock and caused that individual to do the same. As a result, that individual himself purchased 2,015 shares of MetroWest stock that same day, at prices ranging from $8.25 to $8.30 per share.

33. Epstein bought an additional 1,000 shares of MetroWest stock on or about June 1, 2001, at $8.39 per share. He then purchased another 1,000 shares on June 6, 2001, at $8.35 per share.

34. In total, Epstein bought 9,000 shares of MetroWest stock and caused another individual to purchase 2,015 shares while Epstein was in possession of material, nonpublic information concerning the potential acquisition of MetroWest.

### *Other Individuals Who Purchased MetroWest Stock*

35. While in possession of the material, nonpublic information that MetroWest potentially would be acquired, Glick directly or indirectly caused four other

individuals to purchase a total of 11,450 shares of MetroWest stock between May 18 and June 8, 2001, at prices ranging from $7.65 to $9.50 per share.

### *The Announcement of the MetroWest Acquisition*

36. On the morning of June 11, 2001, Banknorth publicly announced for the first time that it was going to acquire MetroWest. MetroWest's stock price rose in the wake of the news, closing at $11.22 per share, up 15.07% from its $9.75 per share price at the close of the market the preceding day. By their MetroWest trading, Defendants Freedman, Epstein and Moore, as well as those individuals Glick and Epstein caused to buy MetroWest stock, profited by a total of $99,512.25. In particular, Freedman profited by $28,385, Epstein profited by $28,220, Moore profited by $7,550.75, the individual Epstein caused to buy MetroWest stock profited by $5,889, and the four others Glick caused to buy MetroWest stock profited by a total of $29,467.50.

### *The Defendants' Breach of Fiduciary Duties*

37. At all relevant times, Glick was an insider of MetroWest who had a fiduciary duty to the company and its shareholders not to trade, or direct others to trade, in the company's securities while in possession of material, nonpublic information about the company. Glick was also subject to MetroWest's insider trading policy, which prohibited tipping individuals to material, nonpublic information or using material, nonpublic information as a basis for recommending the purchase of a security.

38. When Glick disclosed material, nonpublic information concerning MetroWest's potential acquisition to Freedman, Epstein and Moore, and caused the other four individuals to buy MetroWest stock at a time when Glick was in possession of the information, Glick violated his fiduciary duty to MetroWest and its shareholders.

39. Freedman, Epstein and Moore each knew or was reckless in not knowing that when Glick disclosed the material, nonpublic information regarding the potential acquisition of MetroWest to him, Glick breached a duty that he owed to MetroWest and its shareholders. Each of them therefore assumed a fiduciary duty to MetroWest and its shareholders not to trade in MetroWest stock or cause others to do so while in possession of material, nonpublic information about the potential acquisition of MetroWest.

40. When Epstein caused another individual to purchase MetroWest stock, Epstein violated the fiduciary duty he had assumed to MetroWest and its shareholders.

**B.     The Medford Acquisition**

41. Upon Banknorth's acquisition of MetroWest in 2001, Glick became a director of Banknorth.

42. On or about June 6, 2002, Glick learned from Banknorth's Chief Executive Officer at a Banknorth board meeting (the "June 6 Board Meeting") that Medford was seeking to be acquired. At the time, Glick understood that information to be confidential.

43. While in possession of the material, nonpublic information that Medford was seeking to be acquired, Glick caused another individual to buy 3,900 shares of Medford stock on June 6, 2002, at prices ranging from $26.38 to $26.44 per share.

44. On June 13, 2002, Citizens Financial Group, Inc. announced that it was going to acquire Medford, which caused Medford's stock price to close at $34.67 per share that day, up 18.32% from its closing price of $29.30 per share on June 12, 2002. The individual who Glick caused to buy Medford stock thereby profited by $32,211.

### *Glick's Breach of Duty to Medford and Banknorth*

45. At all relevant times, Glick had a fiduciary duty to Medford and its shareholders not to trade, or direct others to trade, in the company's securities while in possession of the material, nonpublic information he had learned about the company. Glick was also subject to Banknorth's insider trading policy, which prohibited tipping individuals to material, nonpublic information regarding other companies, or using such material, nonpublic information as a basis for purchasing, or recommending the purchase of, the security of such a company.

46. When Glick caused another individual to purchase Medford stock on June 6, 2002, at a time when Glick was in possession of material, nonpublic information that Medford was seeking to be acquired, Glick violated his fiduciary duty to Medford and its shareholders, as well as his fiduciary duty to Banknorth and its shareholders.

### C.   **The Warren Acquisition**

47. At the June 6 Board Meeting, Glick also learned that Banknorth was interested in potentially acquiring Warren. At the time, Glick understood that information to be confidential.

### *Defendant Glick*

48. On June 6 or 7, 2002, while in possession of the material, nonpublic information regarding Banknorth's interest in potentially acquiring Warren, Glick directed his stockbroker to purchase Warren stock on Glick's behalf. From on or about June 7, 2002 through July 23, 2002, Glick bought 43,700 shares of Warren stock, at prices ranging from $11.23 to $12.00 per share. At a Banknorth board meeting on July 23, 2002, Glick learned that Banknorth was in fact going to announce that it would be

11

acquiring Warren. Shortly after July 23, 2002 and before the public announcement of Banknorth's acquisition of Warren on August 8, 2002, Glick sold the Warren shares he had purchased since June 7.

49. While in possession of the material, nonpublic information that Banknorth was interested in potentially acquiring Warren, Glick caused another individual to purchase 10,000 shares of Warren stock on June 10, 2002, at prices ranging from $11.80 to $11.90 per share.

### *Defendant Pendolari*

50. On or about June 10, 2002, Glick called Defendant Pendolari. During that call, Glick tipped Pendolari that Banknorth was interested in potentially acquiring Warren. At the time, Pendolari knew that Glick was a director of Banknorth. On June 12, 2002, Pendolari purchased 400 shares of Warren stock at $11.94 per share.

51. Pendolari thereafter caused another individual to buy 1,100 shares of Warren stock (at $12.20 per share) on or about July 15, 2002.

52. In addition, on or about July 23, 2002 at 4:45 p.m., after learning earlier that day at a Banknorth board meeting that Banknorth was in fact going to announce that it would be acquiring Warren, Glick called Pendolari and tipped him to this material, nonpublic information concerning Warren. Again, at the time, Pendolari knew that Glick was a director of Banknorth. The next day, Pendolari purchased 400 additional shares of Warren stock at $12.00 per share.

53. In total, Pendolari bought 800 shares of Warren stock and caused another individual to buy 1,100 shares of Warren stock while Pendolari was in possession of material, nonpublic information concerning the potential acquisition of Warren.

### *Announcement of the Warren Acquisition*

54. After the market closed on August 8, 2002, Banknorth announced that it was going to acquire Warren. By the close of the market on August 9, 2002, Warren's stock price rose to $15.58 per share, up 35.47% from its closing price of $11.50 per share the day before. As a result of their trading in Warren stock, Pendolari profited by $2,896, and the two individuals Glick and Pendolari caused to buy Warren stock profited by a total of $40,873.

### *Glick's and Pendolari's Breaches of Duties to Warren and Banknorth*

55. At all relevant times, Glick had a fiduciary duty to Warren and its shareholders not to trade, or direct others to trade, in the company's securities while in possession of the material, nonpublic information he had learned about the company. Glick was also subject to Banknorth's insider trading policy, which prohibited tipping individuals to material, nonpublic information regarding other companies, or using such material, nonpublic information as a basis for purchasing, or recommending the purchase of, a security of such a company.

56. While in possession of material, nonpublic information that Banknorth was interested in potentially acquiring Warren, Glick tipped Pendolari to this information, caused another individual to buy shares of Warren stock, and purchased Warren shares for himself. In doing so, Glick violated his fiduciary duty to Warren and its shareholders, as well as his fiduciary duty to Banknorth and its shareholders.

57. Pendolari knew, or was reckless in not knowing, that when Glick disclosed the material, nonpublic information to him about the potential acquisition of Warren, Glick breached duties that he owed to Warren, Banknorth and their respective

shareholders. Pendolari therefore assumed a fiduciary duty to Warren and its shareholders not to trade in Warren stock or cause others to do so while in possession of material, nonpublic information about the potential acquisition of Warren.

58. When Pendolari caused another individual to purchase Warren stock at a time when Pendolari was in possession of material, nonpublic information that Banknorth was interested in potentially acquiring Warren, Pendolari violated the fiduciary duty he had assumed to Warren, Banknorth and their respective shareholders.

## CLAIM FOR RELIEF

### (Defendants Glick, Freedman, Epstein, Moore and Pendolari) Violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder

59. The Commission repeats and incorporates by reference the allegations in paragraphs 1 –58 of the Complaint as set forth fully herein.

60. By reason of the foregoing, Defendants Glick, Freedman, Epstein, Moore and Pendolari each directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain individuals, including sellers of MetroWest, Medford and Warren stock.

61. As a result, Glick, Freedman, Epstein, Moore and Pendolari each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

a.  Enter a permanent injunction restraining each of Glick, Freedman, Epstein, Moore, and Pendolari, their agents, servants, employees and attorneys, and those individuals in active concert or participation with them who receive actual notice of the injunction by individual service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.  Require Glick, on a joint and several basis, to disgorge the profits from the illegal trading of Freedman, Epstein, Moore, Pendolari, and the profits of all other individuals who he, Epstein and Pendolari caused to buy stock, plus prejudgment interest;

c.  Require Freedman and Moore to each disgorge the profits from their respective illegal trading, plus prejudgment interest;

d.  Require Epstein to disgorge the profits from his illegal trading and from the trading of the individual he caused to buy stock, plus prejudgment interest;

e.  Require Pendolari to disgorge the profits from his illegal trading and from the trading of the individual he caused to buy stock, plus prejudgment interest;

f.  Order Glick, Freedman, Epstein, Moore and Pendolari to each pay a civil monetary penalty, pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

g.  Permanently bar Glick, pursuant to Section 21(d)(2) of the Exchange Act

[15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §§ 78l(b), 78l(g) and 78o(d)];

      h.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

      i.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

_____

Luke T. Cadigan (Mass Bar No. 56117)
Senior Trial Counsel

Bradford E. Ali (Mass Bar No. 649541)
Senior Counsel

73 Tremont Street, Suite 600
Boston, MA 02108
(617) 424-5900    ext. 203 (Cadigan)
                          ext. 118 (Ali)
(617) 424-5940    (facsimile)

Dated April 22, 2004