## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION )<br><br>Plaintiff, )<br><br>)<br><br>)<br><br>)<br><br>ALLEN M. GLICK, ARTHUR H. FREEDMAN, )<br>JEFFREY S. EPSTEIN, STEVEN T. MOORE )<br>and ROMEO J. PENDOLARI, )<br><br>)<br><br>Defendants. ) | C.A. No. 04-CV-<br>10801(MEL) |

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
### MEMORANDUM SUPPORTING MOTION
### FOR PAYMENT TO THE UNITED STATES TREASURY

Plaintiff Securities and Exchange Commission ("SEC") files this memorandum in support of its motion for an order directing payment to the United States Treasury of funds presently in the Registry of the Court in the case.

## I.    INTRODUCTION

The SEC brought this action against the Defendants claiming that they violated the federal securities laws. The Complaint alleged that the Defendants committed illegal insider tipping and/or trading in the stocks of three separate publicly-traded banks during 2001 and 2002. The Complaint was filed on April 22, 2004, and was simultaneously settled by all of the Defendants. This action has been resolved with respect to each of the Defendants.

The Court's Final Judgment by consent against Defendant Allen M. Glick ("Glick"), entered on April 26, 2004, enjoined him from violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and required him to pay disgorgement of $98,823.50, plus prejudgment interest in the amount of $10,555.82, and a civil penalty of $165,875.25. Defendant Glick satisfied the Final Judgment by paying a total of $275,254.57 to the Registry of the Court.

The Court's Final Judgment by consent against Defendant Arthur H. Freedman ("Freedman"), entered on April 26, 2004, enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and required him to pay disgorgement of $28,385, plus prejudgment interest in the amount of $3,590.10, and a civil penalty of $28,385. Defendant Freedman satisfied the Final Judgment by paying a total of $60,360.10 to the Registry of the Court.

The Court's Final Judgment by consent against Defendant Jeffrey S. Epstein ("Epstein"), entered on April 26, 2004, enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and required him to pay disgorgement of $34,109, plus prejudgment interest in the amount of $4,314.06, and a civil penalty of $34,109. Defendant Epstein satisfied the Final Judgment by paying a total of $72,532.06 to the Registry of the Court.

The Court's Final Judgment by consent against Defendant Steven T. Moore ("Moore"), entered on April 26, 2004, enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and required him to pay disgorgement of $7,550.75, plus prejudgment interest in the amount of $955.01, and a civil penalty of $7,550.75. Defendant Moore satisfied the Final Judgment by paying a total of $16,056.51 to the Registry of the Court.

2

The Court's Final Judgment by consent against Defendant Romeo J. Pendolari ("Pendolari"), entered on April 26, 2004, enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and required him to pay disgorgement of $6,624, plus prejudgment interest in the amount of $302.96, and a civil penalty of $6,624. Defendant Pendolari satisfied the Final Judgment by paying a total of $13,550.96 to the Registry of the Court.

The Court has ordered the Clerk of the Court to hold the funds received in this case in the Court Registry Investment System ("CRIS") account established by the Court for this case. In the course of this action, the CRIS account received deposits totaling $437,754.20, of which (i) $275,254.57 came from Defendant Glick; (ii) $60,360.10 came from Defendant Freedman; (iii) $72,532.06 came from Defendant Epstein; (iv) $16,056.51 came from Defendant Moore; and (v) $13,550.96 came from Defendant Pendolari. These funds await the Court's approval of a distribution plan to be submitted by the SEC.

The SEC now requests that the Court enter an order directing that these funds and interest earned be paid into the United States Treasury. The time is ripe for the Court to order a final disposition of the money in the CRIS account. Although it is the SEC's policy wherever reasonably possible to recommend a distribution plan by which unlawful gains are paid to defrauded investors, the facts and circumstances of this case make it impracticable to identify and locate injured parties with quantifiable claims. Accordingly, the SEC moves the Court to enter the accompanying proposed order directing the CRIS to pay the deposited sums, plus all accrued interest, to the United States Treasury.

3

## II.     PROPOSAL FOR PAYMENT TO TREASURY

### A.     The Equitable Remedies Ordered in This Case

As the Second Circuit has observed: "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *see also SEC v. Lorin*, 76 F.3d 458, 461-62 (2d Cir. 1996) (per curiam); *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-04 (2d Cir. 1972). The equity jurisdiction of this Court has been properly invoked by a showing of securities law violations.

### B.     The Funds in the CRIS Account Should Be Distributed to the Treasury

"[T]he primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *SEC v. Commonwealth Chemical Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978). *See also First Jersey Sec., Inc.*, 101 F.3d at 1474 (same); *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991) (same); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (same). In *Tome*, the court added that "'[o]nce the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud.' Whether or not any investors may be entitled to money damages is immaterial." 833 F.2d at 1096 (quoting *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985)).

Although disgorged money is often distributed to victims of the violation in accordance with a plan proposed by the SEC and approved by the court, such a distribution is not required by

4

statute, and may be impracticable "where numerous victims suffered relatively small amounts; where the victims cannot be identified; [or] where there are no victims entitled to damages." *SEC v. Lorin*, 869 F. Supp. 1117, 1129 (S.D.N.Y. 1994) (citations omitted); *see SEC v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 507 (S.D.N.Y. 1997), *aff'd sub nom. SEC v. Fischbach*, 133 F.3d 170 (2nd Cir. 1997). Thus, whether it is feasible and appropriate to effect such a distribution depends on whether there are identifiable victims who were injured by the violation and, if so, whether the costs associated with identifying them and distributing the money can be justified relative to the *pro rata* amounts the victims stand to receive. Where distribution to identifiable injured parties is not feasible or appropriate, the money disgorged by the defendant has been paid to the Treasury. *See, e.g., SEC v. Dimensional Entm't Corp.*, [77 Civ. 5290] 1996 WL 107290 at *11 (S.D.N.Y. Mar. 12, 1996) (ordering payment to Treasury of disgorgement fund of $366,277 in complex fraud case involving unlawful distribution and manipulation of securities); *SEC v. Marcus Schloss & Co., Inc.*, 714 F. Supp. 100, 103 (S.D.N.Y. 1989) (denying third party claim against disgorgement fund in insider trading case and ordering payment of disgorgement money to Treasury); *SEC v. Courtois*, [1984-85 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,000 (S.D.N.Y. April 11, 1985) (disgorgement paid to Treasury in view of difficulty of identifying particular claimants and likelihood that distribution would result in only nominal distribution to claimants).

Given the facts and circumstances of this case, distribution of the funds in the CRIS account other than to the Treasury would be neither feasible nor appropriate. The insider tipping and trading by the Defendants in this case involved their purchases of stocks of three separate banks during 2001 and 2002 in advance of news concerning the acquisition of those banks that

5

drove up the stock prices. Thus, injured investors in an insider trading case such as this one could include investors who, because they did not have the same inside information as the Defendants, sold their stock in those same banks around the same time that the Defendants bought their stock. In some cases, injured investors could be the very same sellers of stock who are on the other side of the transaction(s) in which the Defendants bought stock. In other cases, injured investors could be viewed as any investors who sold their stock on the same day(s) that the Defendants bought stock. In either situation, the SEC staff's experience with such matters is that it takes an enormous amount of time and resources to identify and then locate such investors.

The SEC staff has already spent well over 100 hours analyzing the feasibility of distributing the funds in this case to investors and attempting to identify potentially injured investors. The SEC staff estimates that it would take at least another 100 hours, and perhaps significantly more time, to complete the process of attempting to identify and locate injured investors. Even then, the SEC staff's experience in such matters is that a significant number of investors will remain unidentified and/or unable to locate. In some cases, spending such resources to identify and locate injured investors in an insider trading case may be feasible and appropriate, especially if the pool of money available to compensate injured investors is relatively large and/or the number of injured investors is limited. In this case, $437,754.20 was paid to the CRIS by the Defendants. However, only a portion of that (approximately $241,000) would likely be utilized to compensate injured investors.[1] This is a relatively modest amount for

---

[1] During the course of the over 100 hours of time the SEC staff has spent thus far analyzing the feasibility of distributing funds in this case, the SEC staff has devised the rough contours of one possible plan to distribute funds. That plan involves first determining the amount of available money in the plan on each of the 15 trading days at issue in each of the three subject bank stocks, and then determining the number of investors who sold shares of the stocks on those days, including the total number of shares sold in relation to the number of shares purchased by the
(continued...)

6

use in a distribution fund to investors in an insider trading case. The exact number of potentially

injured investors is not currently known. However, the SEC staff's analysis to date indicates

there may be a total of at least 110 distinct traders (both individuals and entities) on fifteen

separate trading days who could be eligible for some portion of the disgorgement fund. The SEC

staff's experience in this type of case is that the more difficult part of the feasibility analysis is

not determining the number of investors who may be eligible for a portion of the disgorgement

fund, but actually identifying and locating those investors, which can be a monumental task, even

when the number of traders is 110.[2]

---

[1](...continued)

Defendants. On seven of the 15 days, there is more than enough money available to distribute to all sellers of that stock on that day, and the excess (approximately $129,000) would properly be distributed to the Treasury. The reason there is more than enough money on these seven days is because one or more of the Defendants paid penalties in addition to disgorgement, thereby creating the excessive funds. On the other eight trading days at issue, there is not enough money available to distribute to all (or nearly all) sellers of the stock on each day, but there is enough to pay those who actually sold stock to the Defendants. In those cases, the distribution could be made to those who actually sold to the Defendants (but not other sellers) and the excess ( approximately $67,000) would be distributed to the Treasury. Taking the $67,000 together with the $129,000, a total of approximately $196,000 would be distributed to the Treasury under the SEC staff's preliminary plan, and approximately $241,000 would be distributed to investors who sold stock on particular days that the Defendants purchased stock.

[2]  The data currently possessed by the SEC staff includes the names of certain, but not all, sellers of the relevant stocks. In many instances, the stock was sold to one of the Defendants by a "market maker," which is a securities firm in the business of facilitating trading in a particular security by matching buyers and sellers, while often holding shares of a particular security in reserve for periods of time. To determine whether it was the market maker wronged by selling the stock to one of the Defendants, or an individual who sold the stock to one of the Defendants through a market maker, is an extremely challenging and time-consuming task. Logistically, it involves extensive effort involving multiple requests to numerous broker-dealers for various books and records in order to get to the ultimate individual transactions between the Defendants on one side of a trade and a market maker or individual or entity investor on the other side of a trade. Further, in the SEC staff's experience, challenges present themselves in locating individual and entity investors once they are identified, for example when individual investors move, pass away, or divorce, or when entity investors dissolve. The further away in time from the actual trading activity, the more these challenges present themselves. In this case, the trading activity occurred in three different bank stocks in May-June 2001 and June-August 2002. Thus, a significant amount of time has passed since the period of the relevant trading activity, which will likely increase the difficulty in locating affected investors.

The SEC staff does not believe it would be an appropriate use of SEC resources for the SEC staff to complete the process of identifying and locating the potential victims, determining the amount of losses of each investor, and distributing the funds to the investors. In the alternative, the Court could appoint a receiver to attempt to do this work. However, the SEC staff believes it would take any receiver a significant amount of time to learn the facts of this case, and the receiver would thereafter face the same difficulties in identifying and locating injured investors. The amount of time it would take for a receiver to complete such an effort would likely cost a significant amount of money that would have to be paid out of the corpus of the disgorgement fund paid by the Defendants.[3] In addition, even if a receiver were appointed to do this work, the SEC staff expects that significant SEC staff resources would likely be spent assisting the receiver in its work, and again the SEC staff does not believe this would be an appropriate use of SEC resources.

In view of the difficulty, amount of time involved, and cost of identifying and locating the potential victims in this type of case, distributing the recovered funds on a *pro rata* basis would be unfeasible. Consequently, the SEC staff believes it is not feasible to distribute the funds in the Registry of the Court to investors. Accordingly, instead of attempting to distribute to defrauded investors the funds in the CRIS account, it would be more feasible and appropriate to pay the funds into the Treasury.

### III. CONCLUSION

For the foregoing reasons, the SEC requests that the Court order that the disgorgement paid in this action, specifically the funds presently in the CRIS account, plus interest thereon, as

---

[3] However, it is possible that a receiver's fees could be paid in part, or perhaps in full, using the remaining funds to be disgorged to the U.S. Treasury under one possible distribution plan referenced in Footnote 1 above.

well as any other funds obtained from the Defendants, be disbursed to the SEC, which will remit

the funds into the United States Treasury.

Respectfully submitted,

Luke T. Cadigan (Mass Bar No. 56117)
Senior Trial Counsel

Bradford E. Ali (Mass Bar No. 649541)
Senior Counsel

73 Tremont Street, Suite 600
Boston, MA 02108
(617) 573-8903        (Ali)
(617) 424-5940        (facsimile)

Date:    May 19, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2005, I caused copies of the foregoing document to be served on the defendants and/or counsel for the defendants all by first class mail at the addresses indicated below:

Counsel for Defendant Glick
Richard P. Swanson, Esq.
Thelen, Reid & Priest LLP
875 Third Avenue
New York, NY 10022

Counsel for Defendant Freedman
Stephen Poss, Esq.
Goodwin Procter
Exchange Place
Boston, MA 02109

Counsel for Defendant Epstein
Richard B. Michaud, Esq.
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

Counsel for Defendant Pendolari
Michael T. Gass, Esq.
Palmer & Dodge LLP
111 Huntington Avenue at Prudential Center
Boston, MA 02199-7613

Steven T. Moore          (Pro se)
13433 Northwest 3rd Street
Ocala, Florida 34482

_____
Bradford E. Ali, Esq.